JOHN TRUAX v. THE PHILADELPHIA, WILMINGTON and BALTIMORE RAILROAD COMPANY.

AN arrangement between the Philadelphia, Wilmington and Baltimore Railroad Company and a committee of a peach-growers' convention to run a special daily train during a peach season to Philadelphia, there to connect with the Camden and Amboy Railroad for the transportation of peaches to New York, and which before the commencement of the season, was duly advertised by the company for that purpose, to leave the several stations on their road in the State at the respective hours stated

each day (Saturdays and Sundays excepted), and reach Philadelphia about a certain hour in the evening, with the view to make such connection, and in time for the next morning's market in New York, will not constitute a special contract between the company and a shipper of peaches from the State to New York during the season, to transport his peaches by such train.

The P. W. & B. Railroad Company is a common carrier, invested with all the rights and privileges, and subject to all the duties and responsibilities of common carriers for hire. As such, it is clothed by its charter with special and extraordinary powers and privileges; and is designed and expected to furnish to the public special facilities and accommodations. It is its duty to provide suitable engines, cars and all necessary appliances, fully sufficient to accommodate the ordinary and probable business of the road. It is its duty as a common carrier, to receive and carry the goods offered for transportation, upon payment or tender of reasonable compensation, to the full extent of its means of transportation. And if it refuses to carry goods offered at a proper time, and in proper condition, having sufficient accommodations and means for carrying them, it is liable in damages for the breach of its duty. On the other hand, however, it may lawfully refuse to receive goods offered for transportation, when they are offered at unreasonable times, or when the cars are full, or when the goods are not in fit condition, or not properly packed, or when the company has no convenient means of carrying them with safety, or when the means of carrying them are all exhausted. And moreover, as a common carrier, it is not responsible for delay caused by an unusual press of business, or influx, or accumulation of freight exceeding its ability to carry, where it makes no undue discriminations among owners, and carries the freight offered, as soon as it can consistently with its accommodations, and with its duty to forward freight previously offered. But when it has once accepted goods delivered for transportation, it is bound safely to keep, safely to carry and safely to deliver them. Common carriers are treated in a certain sense, as insurers of the final safe delivery of the goods; but they are not insurers as to the time of delivery, unless there is a special contract to deliver at, or within, a specified time. And as a common carrier, it is held responsible for all losses, except those occasioned by inevitable accident, called the act of God, or of the public enemy. The act of God denotes such causes as are beyond the control of the carrier, and produce loss without the intervention of human agency. This rule of law, however, must be understood with the following qualifications, namely, that the carrier is not to be held responsible for ordinary wear or tear, and chafing of the goods in the course of their transportation, or for their ordinary loss or deterioration in quantity or quality, or for any inherent natural infirmity or tendency to damage, depreciation or decay, or for the depreciation or decay of perishable articles where there is no negligence on the part of the carrier, or for any loss arising from bad, imperfect, or careless packing by the owner or his agents.

Ordinarily to render a carrier responsible, there must be an actual delivery of the goods to him, or his servants, or some other person authorized to act in his behalf. In the case of a railroad company, the goods must be delivered to its authorized agents, and such a delivery is usually made at a railroad station, to a freight agent or station master. In order to charge the company and fasten on it the liability of a common carrier, the goods must be delivered into the exclusive custody of the company, and accepted by the latter in that capacity for transportation. So long as the owner, or his agent retains the custody and control of them, there has been no such delivery and acceptance, as will charge the carrier. But this rule may be modified or changed by arrangement between the parties in regard to the place, or mode of delivery, or by an established custom or usage of the company to the contrary. But there can be no doubt that a delivery on board the cars for transportation with the consent of the proper agent of the company, amounts to a perfect delivery and acceptance, and subjects the company to all the legal responsibilities of common carriers. Peaches, however, placed by the owner or his agent in a granary or store house at a station, the use of which had been granted to him as a privilege and for his own convenience, to await shipment next day, should not be considered a delivery to the railroad company, so as to charge them as common carriers. Nor can the mere placing of them on the ground at or near the railroad station, without their being taken in charge by the agent of the company, be considered such a delivery. But if placed there by the direction of the proper agent of the company, it would amount to a sufficient delivery and acceptance to charge them as common carriers.

The carrier is bound to use reasonable expedition, and to deliver the goods within a reasonable time. Goods transported by railroad, must be put upon their transit within a reasonable time, and be delivered within the usual time after their arrival at their place of destination. But if retarded, obstructed, or delayed in their transit, by accident, misfortune, or other sufficient cause, though not resulting from the act of God, or of the public enemy, the carrier will not be rendered responsible for loss or damage occasioned by such delay, provided he has used due and reasonable diligence in the transportation to guard against delay, and the goods are finally delivered in safety. But what will amount to due diligence in this respect, must necessarily depend upon the peculiar, or special circumstances of each particular case; and the diligence of the carrier may be increased by the agreement of the parties, or by the nature of the freight transported, as where, for instance, it is of a perishable nature; for any thing of this kind may very properly be considered as affecting, more or less, the question of due and reasonable diligence.

Although the arrangement entered into for running the train, and the subsequent advertisement of it by the company, did not amount to a special contract on their part for that purpose, nevertheless, when peaches were afterward actually delivered to, and accepted by, the company for transportation according to the advertisement, a contract arose between

the parties, not, however a special contract in the sense in which those terms are understood in the law, but a contract arising out of, or created by force of the general law applicable to the company as common carriers for hire. The prime end sought to be attained by the parties to it, was to have the peaches, which should be shipped by it, placed in Jersey City or New York with the least possible delay; and each of the parties recognizing the perishable nature of the freight to be carried by it, time seems to have been deemed by both an important element to be considered, on account of the perishable nature of the freight and its liability to speedy decay; and that certainly rendered the time of the departure of the trains from the stations at which the plaintiff shipped his peaches, and the time occupied in making the transit from these stations to Philadelphia, matters of special importance to be considered by the jury in one aspect, at least, of the case, in determinning the question of negligence, or want of due diligence.

As to the delivery of the peaches to the other and connecting company, the Camden and Amboy, at the connection of their routes by the defendants under the separate arrangements made with the two companies for the purpose, the moment the cars of the defendants reached the points of connection between the two companies, and the engine was detached, or cut loose from the train, the delivery of them was complete, and the defendant's duty ended, and the duty and responsibilities of the connecting company commenced and continued until they had delivered them at their proper point of delivery in Jersey City, and the defendants are in no respect whatever liable or responsible for any loss or damage which the plaintiff may have sustained by reason of the misconduct, negligence, or default of that or any other company concerned after that in the transportation and delivery of them.

THIS was an action of assumpsit at the suit of John Truax against the Philadelphia, Wilmington and Baltimore Railroad Company, for alleged damages sustained by him during the peach season of 1864, by reason of the failure of the company to carry and transport for him pursuant to the arrangement entered into with the committee appointed by the convention of peach-growers of the State, held in Dover in the month of May in that year, forty-five thousand baskets of peaches, in proper time to the cities of Philadelphia and New York, from the stations on their railroad at Smyrna, Brentford and Moreton, and for loss of baskets not returned, and for destruction of peaches by collision of cars in transit on their road, to the aggregate amount of twenty-eight thousand five hundred

dollars; and as the facts and circumstances involved and the evidence adduced in it, were substantially the same as in the case of *Reed and Walker v. The Philadelphia, Wilmington and Baltimore Railroad Company*, tried at the preceding term of the court in Kent County, and reported at length in the present volume, *ante page* 176, and as all the material facts and questions of law presented and discussed in the trial of it, are very clearly and fully stated in the learned and able charge delivered by the Chief Justice to the jury in the case, the author considers it quite sufficient after this brief statement and reference to the case before mentioned and so recently decided in this court upon the same questions, to proceed without further reference to the evidence or the arguments of counsel, to report it as delivered by him.

*The Court, Gilpin C. J.*, charged the Jury.

This is an action of assumpsit brought by the plaintiff, John Truax, against the Philadelphia, Wilmington and Baltimore Railroad Company, to recover from them compensation, by way of damages, for certain alleged grievances and defaults on its part, which are both generally and specially described and set forth, in the plaintiff's declaration of complaint. These grievances and defaults are variously stated in the many different counts of the plaintiff's declaration, but it is hardly necessary for your enlightenment, or for a proper understanding of the case, that I should go into a particular examination or analysis of the pleadings on the record. It will suffice for all the purposes of the case to state to you briefly and in general terms, the ground upon which the plaintiff claims to be entitled to recover. In the *first* place he grounds his right to recover upon a *special contract*, which he alleges the defendant made with him in the latter part of May or the first of June, in the year 1864, through the agency of a committee of the peach-growers convention, to transport his peaches, during the peach season of that year, over the P. W. & B. Railroad, from Smyrna, Brentford and Moreton stations, on the

Delaware railroad, to Washington street wharf in the city of Philadelphia, within certain definite and specified times. And *secondly*, he founds his right to recover upon the ground of the general responsibility of the defendant as a *common carrier* for hire, aside from and independently of any special contract whatever. The first thing, therefore, to be considered, is the question of a special contract. Was there such a contract between the parties? Now, if no special contract has been proved, and more especially, if it has been shown that no such contract existed, it is the duty of the Court to say so, and thus to disembarrass the case of what does not properly belong to it. Now, in order to make the subject intelligible to your minds so that it may be fairly disposed of, I am compelled to advert to the testimony somewhat in detail. If I mistake or misstate the facts, I beg of you to correct me. It appears from the evidence that the peach growers of Delaware, anticipating a large crop, and considering the perishable nature of the fruit, and knowing from past experience, how very important it was for their interest, to have the crop carried to market in due season, and in good condition of preservation, met at Dover in convention, in the month of May, 1864, for mutual consultation in regard to their interests as peach growers; and especially, for the purpose of making, if possible, some suitable arrangement for the safe and speedy transportation of the large crop then antici-pated, over the line of the P. W. & B. Railroad, so as to connect with the Camden and Amboy road, and thus to place the fruit in the New York market without unneces-sary delay. And with a view to the attainment of an end so desirable, the convention appointed a committee of intelligent gentlemen, extensively engaged in growing peaches, and in the purchase and sale of peaches, with authority to proceed to Philadelphia, to confer with Mr. Felton, the President of the company, on the subject, and to ascertain from him, whether, and to what extent, and upon what terms, an arrangement such as they desired, to transport the crop, could, or could not, be made with the

P. W. & B. Railroad Company; and if it could, then to make some suitable arrangement for carrying the crop of the season, or such portion of it, as they might desire to send to the New York market. The interview between the committee and Mr. Felton took place on the last of May or first of June. The views and wishes of the convention were fully presented by the committee, and the conference seems to have been entirely satisfactory to all parties. Mr. Felton, according to the evidence of members of the committee, appears to have manifested an earnest desire to meet their views, and to afford them all reasonable facilities and accommodations for the safe and speedy transportation of the crop. He, in fact, assured them, he would do all in his power to accommodate the business. He told them that in case the committee could make a satisfactory arrangement with the Camden and Amboy road, the P. W. & B. road would engage to perform its part. He suggested to them the necessity of their having a conference with proper agents of the Camden and Amboy Company, for the purpose of ascertaining whether any and what engagement they would be willing to make in furtherance of the common object, namely, the safe and speedy delivery of the peaches at Jersey City. They therefore, sought and obtained an interview with agents of the Camden and Amboy Company; and upon their return, they informed Mr. Felton, that that company would engage to carry the peaches, or other fruit, over their road from Washington street wharf, Philadelphia, to New York, [Jersey City] provided that, at least ten fully loaded cars were or should be delivered to them daily at Washington street wharf, by half past nine o'clock in the evening. Mr. Felton then told the committee, in substance, that in case the Camden and Amboy Company would furnish its proportion of cars, according to the number of miles to be run through from the stations in Delaware, to New York, he would undertake to put on an extra daily train of sixty cars, to run between the stations on the Delaware road, and Washington street wharf Philadelphia,—to leave the

several stations on the Delaware road at certain specified times, and to arrive at Washington street wharf at half past nine o'clock in the evening, so as to connect with the Camden and Amboy train, to leave there about that time for New York. As to the number, or rather the proportion of cars, to be furnished by the companies respectively, Mr. Felton said that that should be a matter of private arrangement between the' companies. In conclusion he assured the committee the arrangement should be, carried out.

During these conversations, the committee gave Mr. Felton their estimate of the magnitude of the crop of the then approaching season, and of the number of baskets to be carried over the road. The number of baskets in 1863 was three hundred and sixteen thousand, and they estimated the number for 1864 at fully double that,—say, at seven hundred and fifty thousand baskets. It was remarked by one member of the committee, that some persons estimated it much higher, even as high as a million of baskets. Mr. Felton thought it would require, in all, one hundred and twenty cars to do the business—forty cars down the road taking in peaches, forty cars on their way to New York, and forty cars returning from New York. According to the testimony of Mr. Todd, on his cross examination, Mr. Felton did not agree to furnish this number of cars, but merely said it would require that number to do the business ; and that his road would furnish its proportion, if the Camden and Amboy would furnish their proportion, and that these respective proportions should be settled by private agreement between them. Doctor Ridgley's version of the conversation is that Mr. Felton said he would put on a special train of sixty cars; but this, he said, Mr. Felton promised to do, upon the expressed condition that the Camden and Amboy road should supply its proper proportion of the cars necessary to accommodate the business, assuming the whole number necessary to be put on, to be one hundred and twenty cars ; but that the proportion to be supplied by each company should be matter of private ar-

rangement. Doctor Ridgeley also stated that some time in the month of August, Mr. Felton told him the Camden & Amboy Company had put on twenty cars, and that that number was all they were required to furnish. Such, gentlemen, is the substance of the testimony of the members of the Committee examined in this case, in regard to the alleged special contract.

Mr. Felton, in his testimony, states in substance that the committee called on him to make an arrangement for carrying the peach crop over his road—that they estimated the crop at half a million of baskets—that he told them, that as far as he was concerned, he would furnish his proportion of the cars to do the · business, provided the Camden & Amboy Company would furnish its proportion of cars, according to the distance to be run;—that if the P. W. & B. road's proportion should be sixty cars, the Camden & Amboy proportion would be more, as the distance on their road was greater and their cars smaller than those of the P. W. & B. road. That the P. W. & B. Company was to deliver the peaches to the Camden & Amboy Company at Washington street wharf—that the committee after they had conferred with the agents of the Camden & Amboy Company, reported to him that the company would put on their proportion of cars; but that in fact they never furnished one-half of the cars they had engaged to supply. That Mr. Townsend, and others, complained to him, that the Camden & Amboy Company had failed to furnish their proper proportion. That Mr. Townsend, who he considered the head and front of the committee, and who made almost all the arrangements, complained of the Washington street wharf route as a failure, owing to the difficulties and dangers attending it, and suggested a change of the point of delivery from there to the " Arsenal junction," and requested Mr. Felton to negotiate with the Camden & Amboy Company on the subject, which Mr. Felton did, and the change of the point of delivery was finally accomplished. That he then arranged with Mr. Townsend for two trains—one to arrive at the Arsenal junction at 9

31

o'clock, and the other at half past 11 o'clock P. M. Now gentlemen, if this new arrangement as to the point of delivery, was made at the instance and request of Mr. Townsend, as the organ of the committee, because the Washington street wharf route had proved a failure, or for any other cause, then we say to you, that from that time forward, for all the purposes of this case, the Arsenal junction became the point of delivery.

Now, it is upon the state of facts touching the arrangement made with Mr. President Felton for the transportation of peaches, as disclosed by the evidence, that the plaintiff relies, as establishing a special contract between him and the defendant in this action, according to the principles or rules of law applicable to the doctrine of mutual promises or undertakings, and corresponding mutuality of obligation. We have been called upon to instruct you upon this subject, and we now say to you that we do not think the proof in this case establishes the existence of a *special contract* between the parties. On the contrary we think there has been an utter failure of proof on this point, for the all sufficient reason that the evidence does not show any mutuality of obligation,—or in other words, because the evidence does not show that both parties were equally bound. The plaintiff was not bound to send peaches, or other fruit, or any thing else, over the road. From first to last, either during the several conversations which took place between the members of the committee and President Felton, at any time prior to the actual delivery of peaches, or at any time afterward, there was not any thing said or done, by the committee or by any member of it, or by the plaintiff, or by any person on his behalf, that could be held to impose upon him any legal obligation whatever. And hence it follows as a legal result, that as the plaintiff was under no obligation to deliver peaches to the company for transportation, the defendant was not legally bound by force of the alleged special arrangement.

We do not mean to controvert the doctrine of the law in regard to mutual promises as found in the books. We

concede it to be well settled, that contracts founded on
mutual promises and undertakings, are perfected and made
binding by the mere consent of the parties,—the promise
or undertaking of one party to do a certain thing, being
the consideration for the promise or undertaking of the
other party, to do or perform some other thing.  But at
the same time, it is also equally well settled, by well consid-
ered adjudications, that all contracts founded on like mu-
tual promises, must become binding or obligatory upon both
parties at the same instant of time, so that each may main-
tain an action upon it, or it will bind neither.  If one only .
is bound, there can be no valid consideration for the prom-
ise of the other, for such promise being purely one-sided,
and naked, is *nudum factum*, and can impose no legal obli-
gation.  Before a party can, therefore, successfully main-
tain an action against another, upon the ground of mutual
promises or undertakings, he must show that he himself is
also equally bound by the engagement ; and hence, it has
become axiomatic in the law, that mutuality of obligation
constitutes the very essence of all contracts founded upon
mutual promises.  Wherever, therefore, there is the want
of such mutuality, and nothing has been *done* by the party
to whom the promise was made, upon the faith of that
promise, the party promising or undertaking may, at any
time before it has been accepted and acted upon, rescind or
retract such promise, or revoke and withdraw such under-
taking, and thus place himself in the same position, as if
it had never been made.  A proposal or offer, whether
verbal or printed, to do a certain thing, or to perform a
certain service, however formal or specific in its terms, is
at most but a proposal or offer, and must remain such
without imposing any legal obligation, until accepted and
acted upon by the party to whom it was made.  And the
party making such proposal or offer, has, at any time before
it has been accepted and acted on, a perfect legal right to
repudiate or withdraw it.  Now, it is in evidence before
you, that as early as the 27th of July, the defendant by its
proper agent, had issued and published to the peach-grow-

ers, in hand-bill form, the terms upon which the company proposed to transport the peach crop of the season of 1864. This was before any peaches had been delivered to the company for transportation, and was in effect a revocation of the alleged arrangement of the last of May or the first of June preceding, and became in fact a substitute for it. The same general remarks which I have just made in regard to the alleged arrangement of May or June, and the same general principles of law, apply with equal force to the hand-bill advertisement of the 27th of July, 1864, so far as respects the question of a special contract. And hence, we say to you, that, under the proof in this case, the plaintiff is not entitled to recover on the ground of a special contract.

We come now to consider the question of the plaintiff's right to recover on the ground of the general common law liability of the defendant, as a common carrier for hire. And we say to you, that it is upon this ground alone, the plaintiff's case must stand or fall. Such of the plaintiff's peaches as were carried by the road, were delivered to and accepted by the defendant under the arrangement of the 27th of July, 1864. The point of delivery was first at Washington street wharf, but was afterward changed at the instance of the active organ of the committee, to the Arsenal junction. Neither of these points is mentioned in the hand-bill. The P. W. & B. railroad company, the defendant, is a common carrier, invested with all the rights and privileges, and subject to all the duties and responsibilities of common carriers for hire. As such, it is clothed by its charter with special and extraordinary powers and privileges; and is designed and expected to furnish to the public, special facilities and accommodations. It is its duty to provide suitable engines, cars, and all necessary appliances, fully sufficient to accommodate the ordinary, and probable, business of the road. It is its duty as a common carrier, to receive and carry the goods offered for transportation, upon payment, or tender of reasonable compensation, to the full extent of its means of transpor-

tation. And if it refuses to carry goods offered at a proper time, and in proper condition, having sufficient accommodations and means for carrying them, it is liable in damages for the breach of this duty. On the other hand, however, it may lawfully refuse to receive goods offered for transportation, when the goods are offered at an unreasonable time, or when the cars are full, or when the goods are not in fit condition, or not properly packed, or when the company has no convenient means for carrying them with safety, or when the means of carrying them are all exhausted. And moreover, as a common carrier, it is not responsible for delay caused by an unusual press, or influx, or accumulation of freight, exceeding its ability to carry, where it makes no undue discrimination among owners, and carries the freight offered, as soon as it can consistently with its accommodations, and with its duty to forward freight previously offered. Nor is the defendant bound to receive goods offered for transportation, until near about ready to start the cars on their proper journey. But when the defendant has once accepted goods delivered for transportation, it is bound safely to keep, safely to carry, and safely to deliver them. Common carriers are treated, in a certain sense, as insurers; that is, they insure the final safe delivery of the goods. But they are not insurers as to the *time* of delivery, unless there is a *special contract* to deliver at or within a specified time. And, as common carriers, they are held responsible for all losses, except those occasioned by inevitable accident, called the act of God, or of the public enemy. The act of God denotes such causes as are beyond the control of the carrier, and produce loss without the intervention of human agency. This rule of law, however, must be understood with the following qualifications, namely, that the carrier is not to be held responsible for ordinary wear and tear, and chafing of the goods in the course of their transportation,—or for their ordinary loss or deterioration in quantity or quality,— or for any inherent natural infirmity or tendency to damage, depreciation or decay,—or for the depreciation or decay of

perishable articles, where there is no negligence on the part of the carrier,—or for any loss arising from bad, imperfect, or careless packing by the owner or his agents. With these qualifications, the rule that the carrier is responsible for all losses, except those caused by the act of God or the public enemy, is positive and inflexible.

Having thus, as I trust, without unnecessary prolixity, stated the general doctrine of the law in regard to the carrier's general responsibility, I now proceed to consider briefly, the question of delivery. We have been called upon to charge you upon this point, and it is our duty to do so. What then, in point of fact and of law, amounts to such a delivery as is necessary, in order to charge the defendant as a common carrier, and to determine and fix the commencement of the defendant's risk and responsibility. Ordinarily, to render a carrier responsible, there must be an actual delivery to him or his servants, or to some other person authorized to act in his behalf. In the case of a railroad company the goods must be so delivered to its authorized agents. Such delivery is usually made at a railroad station to a freight agent or station master. In order to charge the company and fasten on it the liability of a common carrier, the goods must be delivered into the exclusive custody of the company, and be accepted by the latter in that capacity, for the purpose of transportation. So long as the owner or his agent retains the custody and control of them, there has been no such delivery and acceptance as will charge the carrier. But acceptance may be either actual or constructive. The general rule, however, is as I have stated, that the delivery must be into the hands of the carrier himself, or to his servants, or to one authorized to receive the goods. But this rule may be modified or changed by arrangement between the parties in regard to the place or mode of delivery. It is perfectly competent for them to make any arrangement they may see fit to adopt; and when once made, the arrangement and not the general rule, will govern

the case.   So too, an established custom or usage on the part of the company in respect to delivery and acceptance of goods deposited for transportation, may relax and modify the stringency of the common law rule.  It will be for you to say, in view of the evidence, whether there was any such arrangement between the parties, either express or implied, or whether there was any established custom or usage in respect to the place or manner of delivery. If nothing of the sort has been shown by the evidence, then the general rule presented by the law, must prevail. But there can be no doubt, however, that a delivery on board the cars for transportation, with the consent of the proper agent of the company, amounts to a perfect delivery and acceptance, and subjects the company to all the legal responsibilities of common carriers.   But peaches placed by the owner or his agent in the old granary or storehouse at Smyrna Station, the use of which had been granted to him as a privilege and for his own convenience, to await shipment next day, should not be considered a delivery to the railroad company, so as to charge them as common carriers.   Nor can the mere placing of them on the ground at or near the railroad station, without there being taken in charge by the agent of the company, be considered such a delivery.   But if the peaches were placed on the ground and left there for transportation by direction of the proper agent of the company, it would amount to a sufficient delivery and . acceptance to charge them as common carriers.   We now come to the question of negligence.   What amounts to negligence ? what is meant by due diligence ?

Although common carriers are not held at common law to be insurers as to the *time* of delivery, but the question as to when, or at what time the delivery should be made, is a question in a case like this, of great practical importance to the shipper or owner of the goods. The general rule upon this point may be stated, thus : The carrier is bound to use reasonable expedition, and to deliver the goods within a reasonable time.   But

what will amount to reasonable expedition, and delivery of the goods within a reasonable time, must, of course, depend upon the special circumstances of each particular case. Goods transported by railroad must be put upon their transit within a reasonable time, and be delivered within the usual time after their arrival at their place of destination. But if they are retarded, obstructed, or delayed, in their transit, by reason of some accident, misfortune, or other sufficient cause, though not resulting from the act of God, or of the public enemy, the carrier will not be held responsible for loss or damage occasioned by such delay, provided he has used due and reasonable precaution and diligence in the transportation. In other words, the carrier may excuse himself for mere *delay* in the delivery of goods, caused by accident, misfortune, or other sufficient cause, though not produced by the act of God, or the public enemy, if he has exerted due care and diligence to guard against delay, and the goods are finally delivered in safety. But as I have already intimated to you, what will amount to due diligence in this respect must necessarily depend upon the peculiar or special circumstances of each particular case. And the diligence required of the carriers may be increased, either by the agreement of the parties, or by the nature of the freight transported, as for instance where it is of a perishable nature. And anything of this kind, may very properly be considered as affecting, more or less, the question of due or reasonable diligence. I have stated to you that neither the arrangement of the last of May or first of June, nor that in hand-bill form of the 27th of July, amounted to a special contract. Nevertheless, it is true in point of law, that when peaches were actually delivered to, and accepted by, the railroad company for transportation, under the arrangement of the 27th of July, 1864, a contract arose between the parties, not however, a special contract, in the sense in which these terms are understood in the law, but a contract arising out of, or created by force of the general law

applicable to the defendant as a common carrier for hire. It seems to us, that, to show that the plaintiff's theory of "a special contract" in regard to *time*, is an assumption unsanctioned by law, and consequently, that it is a fallacy, it is only necessary to carry it out to its logical results. Take for instance, the case of a passenger. Suppose the railroad company to have advertised in newspapers and by hand-bill, a special passenger train, to leave the station at Dover at 9 o'clock in the morning, and to arrive at Philadelphia at one o'clock in the afternoon, and that it would so run during the season. And suppose a person having business at the latter place, and desiring to be there by one o'clock, should take passage on board the train on the faith of the advertisement as to the time of departure and arrival. Now, according to the theory of the plaintiff, as we understand it, a special contract would exist between the passenger and the company, binding the latter at all events, to deliver the passenger in Philadelphia by one o'clock, unless prevented by the act of God, or the public enemy—and that in case of failure to deliver him there by that time, the passenger would have a right of action against the company on the ground of a special contract. This we understand to be the plaintiff's theory : but we do not consider it sound in point of law. And if it is unsound as to passengers, it seems to us to be unsustainable in regard to goods. Such a doctrine would establish a special contract in respect to every package of goods transported over the road in cars professedly run according to published time tables. A theory so extraordinary, and tending so manifestly to disastrous consequences, can not be recognized by this court as sound in principle. And yet, notwithstanding this, we are bound to say to you, it is not only proper, but important, that you should take into consideration these arrangements, especially the arrangement of the 27th of July, 1864, as showing the understanding of the parties in respect to the time and mode of transportation, and the end or object which

32

both parties sought to attain by that arrangement, always bearing in mind that the freight to be carried was of a perishable nature.

Now, what was the prime end sought to be attained by the parties ? It was to have the peach s which should be shipped from the several stations on the Delaware railroad, placed in Jersey City or New York with the least possible delay. And considering the perishable nature of the freight to be carried, and aware of the importance of speedy transit, the defendant on the 27th of July, 1864, made known to the peach growers and dealers, and to the public generally, by public notice in hand-bill form, that during the peach season, commencing on the first day of August then next, a special train of cars would run daily, except Saturdays and Sundays, between the several stations, on the Delaware railroad, and the City of Philadelphia for the transportation ot *perishable freight;* to leave the several stations at certain times therein specified, designed to reach Philadelphia with peaches, &c., about 9 o'clock and 30 minutes in the evening, in season for cars fully loaded for New York to go through to Jersey City, in time for the next morning's market. These were the proposals of the defendant, and it was on the faith of these proposals, that peaches were shipped by the special train, called by some of the witnesses, the " peach train," and by others, the " regular train." Now, time seems to have been deemed by both parties, an important element to be considered, on account of the perishable nature of the freight, and its liability to speedy decay. It is true the defendant was not bound, at all events, as an insurer, to start at the precise time named, nor to arrive and deliver at the time named in the advertisement ; because this strictness or exactness can only be required in the case of a special contract, which in our judgment, does not exist here. Nevertheless, considering the perishable nature of the freight, and and its liability to early decay, the time of departure of the trains from the stations of Smyrna, Brentford and

Mooreton,—the points at which the plaintiff shipped his peaches—and the time occupied in making the transit, from these stations to the City of Philadelphia, are certainly matters of special importance to be considered by you, in at least one aspect of this case, in determining the question of negligence, or want of due diligence. Now as to the points at which the defendant was to deliver the peaches. If you are of opinion from the evidence, that it was first, to deliver them to the Camden and Amboy Company at Washington street wharf, and that the defendant delivered them at that point from the fourth to the twenty-fourth day of August, inclusive; and secondly, if you are of the opinion that from and after the 24th of August, up to the close of the peach season, the siding at the Arsenal Junction was, according to arrangement, the point of delivery, then we say to you, that the moment the cars arrived at these points, and the engine was detached or cut loose, the delivery was complete, and the defendant's duty ended; and immediately upon such delivery the duty and responsibility of the connecting company commenced, and that of the Camden and Amboy continued until they had delivered at their proper point of delivery in Jersey City. And we also say to you that the defendant is in no respect whatever, liable or responsible for any loss or damage which the plaintiff may have sustained by reason of the misconduct, negligence, or default of the Camden and Amboy, Penna. Central, or New Jersey Railroad Companies, or of their respective agents.

Then, as to the measure of damages. The rule of law on this point, is quite well settled, and it is this :—" Damages are given as a compensation, recompense, or satisfaction, to the plaintiff, for an injury actually received by him from the defendant. They should be precisely commensurate with the injury sustained at the hands of the defendant, neither more or less." Such is the rule,—now for its application: If any of the plaintiff's peaches destined for either Philadelphia or New York, were lost or damaged by collision of cars, occuring before delivery at the proper

point of delivery in Philadelphia, then the defendant is responsible for such loss or damage. If the defendant from any cause, save the act of God, or the public enemy, failed finally to deliver the plaintiff's peaches or any portion of them, at the proper point of delivery in Philadelphia, then the defendant is responsible to the plaintiff for such failure to deliver, to the extent of the loss which he has sustained; namely, to the extent of the full value of the peaches lost, or not delivered. If you shall be satisfied from the evidence, considering the unusual press of business, or accumulation of freight, that the defendant, having at hand sufficient accommodations and means for transporting the plaintiff's peaches, unreasonably refused to receive and carry them, then, the defendant is responsible to the plaintiff for such refusal, to the extent of the injury which he has sustained by reason of such refusal. But in estimating the amount of damages on account of such refusal, in consequence of which, as is alleged, peaches were left over, and so delayed in reaching their point of destination, as to become nearly, if not entirely worthless, you must be careful to ascertain, whether under all the circumstances, there was at any time, an unreasonable or inexcusable refusal to accept the plaintiff's peaches; whether the peaches were offered at an unreasonable time, too late, or too early; whether they were in fit condition and properly packed for shipment, and whether or not the cars were sufficiently loaded. The defendant having once accepted the peaches of the plaintiff for transportation, was bound to use all reasonable expedition in the transit, and to deliver them at their proper point of destination, within a reasonable time. If, therefore, you shall be satisfied from the evidence that the defendant neglected to use the means of transportation at command, or failed to exert its best endeavors to make the transit from the stations on the Delaware road to the proper point of delivery in Philadelphia with reasonable dispatch, or in other words, if there was inexcusable or unreasonable delay in the arrival of the cars, then the defendant is responsible on

the ground of negligence, to the extent of the injury or loss which the plaintiff has sustained by reason of such negligence. If there was negligence, there must have been the want or absence of proper care and diligence. So, too, the converse of this proposition is equally true; for if there was due care and diligence, a constant effort to accomplish all that was undertaken, or to do all that ought to be done, there could not be negligence. And in investigating this question it is proper you should take into consideration the magnitude of the peach crop of 1864, its perishable nature, the importance of having it conveyed to market with as little delay as possible, the character of the season as respects the ripening of the fruit, the press of business, the accumulation of freight, the defendant's means of transportation, and whether the Camden and Amboy Company supplied their proper proportion of cars, as well as all other facts and circumstances proved in the case, which are in the least calculated to throw light on the question of negligence.

But if on the other hand you shall be satisfied that the defendant faithfully used the means of transportation at its command, exerting its best endeavors to guard against delay, and used all reasonable care, skill and diligence to transport the plaintiff's peaches from the stations on the Delaware road to their proper point of destination and delivery in Philadelphia, with as little delay as possible under the circumstances, and did in fact deliver them there, although not within the *time* mentioned in the hand-bill, then, we say to you the defendant is excusable for such unavoidable delay, and is not guilty of negligence in this respect, and that the plaintiff is not entitled to recover against them upon this ground.

In conclusion, gentlemen, you will remember the testimony of the witnesses; you have the papers and documentary evidence before you, you are judges of the facts. You have sworn to well and truly try the issues joined in this case, according to the evidence. Divest your minds and hearts therefore of all preconceived opinions and feel-

ings, discard all influences from without, and, applying the law to the facts proved before you, render such verdict as, before God, you believe to be just and right. The case is in your hands.

The plaintiff had a verdict for $2,368.89.

Ridgeley, Saulsbury and Comegys, for plaintiff.

Gordon and Smithers for Defendant.